UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------- X
:::
GEORGE McGUIRE,                                    :        09-CV-464 (ARR)
                                                   :
                    Petitioner,                    :        NOT FOR PRINT OR
                                                   :        ELECTRONIC
        -against-                                  :        PUBLICATION
                                                   :
JAMES WALSH,                                       :        OPINION & ORDER
                                                   :
                    Respondent.                    :
                                                   :
-------------------------------------------------------------------- X

ROSS, United States District Judge:

    Petitioner brings the instant action for a writ of habeas corpus pursuant to 28 U.S.C. §

2254, challenging his 1990 conviction and sentence for murder in the second degree, attempted

murder in the second degree, three counts of assault in the first degree, and three counts of

criminal possession of a weapon in the second degree.  Petitioner argues that: (1) the nine years

the lower New York Court took to decide his N.Y. Crim. Proc. Law § 440.10 motion violated his

due process rights; (2) his trial counsel was ineffective; (3) given the evidence, it is more likely

than not that no reasonable jury would have found petitioner guilty; and (4) the sentence imposed

was improper and unconstitutional.

    For the reasons that follow, the petition is denied.

## BACKGROUND

A. *Petitioner's Trial, Verdict, and Sentencing*

    On December 25, 1988, at approximately 4:15 a.m., multiple shootings occurred outside

Tiny's Lounge located at 422 Utica Avenue in Brooklyn during which four individuals were

shot.  Leslie Lewis was shot in the legs and right arm, John Paul Michel sustained a gunshot

wound to the buttocks, and Robert James sustained a gunshot wound to his left leg. (Tr. at 28-29; 186-87.) Dexter Simmons, the club's DJ, was shot once in the back. The bullet punctured Simmons' lung and lodged in his heart, causing his death. (Trial Tr. at 30, 54A.)

Later that day, petitioner was in his home when he was arrested. Petitioner's arrest was based on a statement made to police by Tanya Kimbrough, who also implicated two other individuals, Craig Twiggs and Harold George. Following his arrest, petitioner was taken to the 71st Precinct, and given <u>Miranda</u> warnings. (Oct. 1, 1990 Huntley Hr'g Tr. at 10.) Petitioner then made a statement to Detective Allen Thorson. Petitioner stated that he had been with his wife in Kings County Hospital in the hours right before the shooting, and that, after he left the hospital, he took a cab to the corner of Utica Avenue, intending to stop by Tiny's. (Huntley Hr'g Tr. at 11.) Petitioner stated that as he approached the club, he heard the shooting and crossed the street. (Huntley Hr'g Tr. at 11.) When the shooting stopped, he and three girls he had met up with walked up the block to their respective homes. (Huntley Hr'g Tr. at 12.)

The Kings County District Attorney indicted petitioner, along with Craig Twiggs and Harold George, for murder, attempted murder, assault and weapons possession in the killing of Dexter Simmons. On February 2, 1989, Harold George and Craig Twiggs were arrested in Pittsburgh, Pennsylvania. Twiggs was in possession of a .22 caliber pistol. The two pled guilty to federal drug trafficking charges, and were subsequently extradited to New York to face charges in the December 25, 1988 incident.

Shortly before trial, petitioner's assigned counsel, Allen Brenner, had to leave the jurisdiction, and Luther Williams was assigned to represent petitioner. Williams was assigned three other homicide cases at the time, all of which were "trial ready." (Nov. 12, 1998 C.P.L. § 440 Hr'g Tr. at 27.)

At trial, eyewitness testimony was provided by Tanya Kimbrough, who testified that she had known petitioner all her life, and saw petitioner, along with Craig Twiggs and Harold George in Tiny's club the night of the shooting. (Trial Tr. at 77.) She testified that there had been about 100-200 people present in the club that night, and that she had observed petitioner, Twiggs, and George go outside, and followed them. (Trial Tr. at 78-80.) She said that there was another individual outside of Tiny's, a tall Jamaican man identified as Leslie Lewis. (Trial Tr. at 84.) She testified that an argument ensued, and that Craig Twiggs began to walk away from her and toward Lewis, and she grabbed his arm "because he had his hand in his pocket." (Trial Tr. at 87.) She stated that petitioner, George, and Twiggs started shooting. (Trial Tr. at 87.) She testified that she observed a black gun in petitioner's hand, approximately four to five inches big. (Trial Tr. at 87-88.) She stated that petitioner was standing by a meter outside on the street, and pointed the gun towards Lewis. (Trial. Tr. at 88.) She also stated that she saw guns in the hands of Harold George and Craig Twiggs, and described their size and color. (Trial Tr. at 88-90.) She stated that she heard "[a] lot" of shots, and that all three individuals were shooting. (Trial Tr. at 91.) She also stated that she saw Dexter Simmons, whom she knew from her building, in the entrance way of Tiny's. (Trial Tr. at 92-93.)

Kimbrough stated that petitioner, Twiggs, and George ran across the street and up Utica Avenue, while she went inside and saw Dexter Simmons lying on the floor. (Trial Tr. at 93.) She also testified that another individual had been shot in the rear end, identified as John Paul Michel. (Trial Tr. at 94.) Kimbrough testified that after an ambulance arrived, she walked up the block with two friends named Jackie and Tanya with the intention of telling Simmons' mother what happened. (Trial Tr. at 95.) She stated that she saw petitioner, George, and Twiggs in lobby of the building where petitioner and Harold George resided. (Trial Tr. 96-97.) After

seeing if anyone was at Simmons' residence, she returned to the scene with Jackie and Tanya. (Trial Tr. at 97-98.)  After encountering an officer at the scene, Kimbrough was taken to the 71st precinct and later made a statement in which she implicated petitioner, Craig Twiggs and Harold George.   Kimbrough testified that Jackie and Tanya were not outside Tiny's at the time of the shooting, and that her friend Latasha Carlisle was inside Tiny's earlier in the evening, but that she did not see Carlisle outside at the time of the shooting. (Trial Tr. at 100-03.)

On cross-examination, trial counsel inquired about a document Kimbrough signed in November of 1989, which recanted statements she had made to police following the night of the incident. (Trial Tr. at 126; 144-45.)  Kimbrough testified that the document was prepared for her and she "skimmed through it" and signed it. (Trial Tr. at 144.)  On re-direct, she testified that petitioner's brother had approached her with the document, and took her to a notary to have it signed. (Trial Tr. at 171.)  She stated that the contents of the November 1989 document were not true. (Trial Tr. at 171.)  Kimbrough also stated that she was told by detectives that "criminal charges would be brought against me" if she did not come in and testify, and that this was the reason for her appearance in the case. (Trial Tr. at 154.)

One of the victims of the shooting, Leslie Lewis, testified for the prosecution, and stated that he noticed three men looking at him, and provided a clothing description, but stated that he didn't "see their face fully because the place was kind of – is not bright, bright for you to see anybody's face." (Trial Tr. at 210-211.)  Lewis, however, did not identify petitioner as a shooter, and stated that he did not recognize anybody from the incident during a photo array conducted by the investigating officers. (Trial Tr. at 249-50.)  The other two victims of the shooting, who also did not identify petitioner during a photo array, and were not called as witnesses by the prosecution as they were unavailable. (Trial Tr. at 198.)  Petitioner's trial counsel attempted to

contact these witnesses, and when he was unable to locate them, he requested that the court allow him to call the investigating detective to elicit from him that neither victim had identified petitioner. The trial court denied the request. (Trial Tr. 371-72.)

Detective John R. Smith, a member of the Pittsburgh Police Department, testified that in February of 1989, he had arrested Harold George and Craig Twiggs in Pittsburgh, and that, at the time, he had recovered a loaded .22 caliber pistol from Twiggs' waistband. (Trial Tr. at 308.) A ballistics expert testified that the bullet removed from Dexter Simmons was fired from that same .22 caliber pistol, and that the evidence at the scene showed that a minimum of two firearms, and possibly four, were fired on the night of the incident. (Trial Tr. at 358-59.)

The defense called Latasha Carlisle, who testified that she knew petitioner from the neighborhood, and did not see him at the club. She stated that she was Tiny's the night of the incident with Tanya Kimbrough and her sister in law Tunisia. (Trial Tr. at 400-01.) She testified that Harold George and Craig Twiggs had an argument with "these Jamaican guys," and then stepped outside. (Trial Tr. at 402-03.) She stated that she went outside of the club and was there with Tanya Kimbrough and Tunisia, and she saw Twiggs and George, whom she also knew, arguing with the Jamaican guys. (Trial Tr. at 405-06.) She stated that she then saw Twiggs, George and a "Jamaican guy" shooting. (Trial Tr. at 406.) She stated that she, Tanya Kimbrough and Tunisia ran across the street, where she saw petitioner ducking down, who told them to "get down." (Trial Tr. at 407.) She stated that after the shots were over, she, petitioner, Tanya Kimbrough, and Tunisia ran up the block. (Trial Tr. at 407-08.)

Carlisle also testified that she was with Tanya Kimbrough in November of 1989 when petitioner's brother approached them, and ignored Kimbrough. She testified that Kimbrough told petitioner's brother that "[i]t ain't my fault. I ain't do nothing. They pressured me. They

pressured me to go. I called up the DA and tell the DA what they said what they made me do. They promised me this and that." (Trial Tr. at 410.) Carlisle then stated that petitioner's brother said he would put Kimbrough's statement in writing. (Trial Tr. at 410.)

On October 20, 1990, the jury convicted petitioner of Murder in the Second Degree, Attempted Murder in the Second Degree, three counts of Assault in the First Degree, and three counts of Criminal Possession of a Weapon in the Second Degree. On November 17, 1990, the court sentenced petitioner as a second violent felony offender to consecutive terms of imprisonment of twenty-five years to life for the murder of Dexter Simmons, and twelve and one-half years for the attempted murder of Leslie Lewis. (Sentencing Tr. at 18.) In addition, the court sentenced petitioner to two concurrent sentences of seven and one-half years to fifteen years on the assault counts, which were to run consecutively to the sentences for murder and attempted murder. (Sentencing Tr. at 18-19.) The court also sentenced defendant to two consecutive sentences of seven and one-half to fifteen years, and one concurrent sentence of seven and one-half to fifteen years on the weapon possession counts. (Sentencing Tr. at 18-19.) These sentences were to run consecutively to the sentences given for the murder, attempted murder and assault counts. (Sentencing Tr. at 19.) The total aggregate sentence amounted to 60 years to life imprisonment. On June 3, 1991, the court sentenced Craig Twiggs and Harold George to fifteen years to life.

B. *Petitioner's Direct Appeal*

On September 3, 1992, petitioner, through counsel, filed a direct appeal in the Appellate Division, Second Department, arguing that: (1) the People's opening statement was legally insufficient; (2) petitioner was absent from a material stage of the trial; (3) the trial court failed to

give a missing witness charge when two eye-witnesses, Jean Paul Michel and Robert James, became unavailable; (4) the court erroneously added language to the verdict sheet; (5) the verdict was repugnant; (6) the court imposed a harsh and excessive sentence; and (7) petitioner received ineffective assistance of trial counsel, because counsel (i) failed to object following the People's opening, (ii) failed to obtain exculpatory evidence, (iii) improperly waived defendant's presence for a portion of the trial, and (iv) failed to "hold" the jury after the verdict was entered.

On June 27, 1994, the Appellate Division affirmed petitioner's conviction. The court held that that "the record demonstrates that the defense counsel effectively cross-examined the People's witnesses, delivered a cogent opening and closing statement, and presented a plausible defense. Thus, the defendant was provided with meaningful representation." People v. McGuire, 205 A.D.2d 805 (2d Dep't 1994). The court also held that petitioner's "sentence was not excessive." Id. On September 21, 1994, the Court of Appeals denied petitioner's request for leave to file an appeal. People v. McGuire, 84 N.Y.2d 870 (1994). On December 1, 1994, the Court of Appeals denied petitioner's motion for reconsideration of his application for leave to appeal. People v. McGuire, 84 N.Y.2d 1013 (1994).

C. *Petitioner's Initial § 440.10 Motions*

On April 20, 1993, while his direct appeal was still pending, petitioner filed a motion to vacate the judgment in the trial court pursuant to N.Y.C.P.L. § 440.10. Petitioner alleged that his arrest was illegal, that petitioner's speedy trial right was violated, and that he received ineffective assistance of counsel. Petitioner argued that his counsel was ineffective for: (1) failing to contact two victims, Robert James and Jean Paul Michel, who were shown photo arrays by police and failed to identify petitioner; (2) failed to call exculpatory witnesses Tanya Walker, Jackie Trader, and petitioner's mother, Maryanne McGuire; (3) did not perform an investigation; (4) waived

petitioner's presence during an aspect of the trial; and (5) failed to object to the repugnant verdict. Petitioner attached an affidavit of Jackie Trader, which stated that Trader had been outside Tiny's Club on the night of the incident, and while leaving, she heard shots and ran with two other girls across the street.[1] She stated that she ducked behind a parked car and saw George McGuire also behind the car yelling "Stay down." (Aug. 10, 1992 Aff. of Jackie Trader, ¶ 4.) The affidavit also stated that after the shooting stopped "we all ran quickly from the area and went home." (Aug. 10, 1992 Aff. of Jackie Trader, ¶ 4.) Trader stated that after petitioner's arrest, she was contacted by petitioner's first attorney, but was never contact by his subsequent counsel, and did not know of the trial until it had concluded. (Trader Aff., ¶ 10-14.) Petitioner also attached an affidavit from Tanya Walker. Walker's affidavit also stated that she had seen petitioner behind the car at the time of the shooting, and that she contacted petitioner's counsel, Luther Williams, who eventually told her that her testimony was not needed. (Aff. of Tanya Walker, ¶ 14-17.)

In March of 1995, petitioner filed a supplemental motion pursuant to N.Y.C.P.L. § 440.10. He argued that trial counsel was ineffective, and that the trial court erred by: (1) allegedly permitting the People to withhold information regarding victims Robert James and Jean Paul Michel; (2) failing to give missing witness charges when Michel and James became available; and (3) allowing the prosecution to introduce into evidence the murder weapon recovered from co-defendant Twiggs. On November 4, 1996, petitioner wrote the court seeking an Order on his § 440.10 motions, and on April 8, 1997, petitioner moved for a writ of mandamus pursuant to Article 78 of New York's Civil Practice Law and Rules to compel the court to issue a decision.

---

[1] In her affidavit, Trader's last name is listed as "Frader." When asked about this at the 440 hearing in 1998, she stated that "I don't know about that F being there. I seen it there, but I don't know." (440 Hr'g Tr. at 17.)

On May 1, 1997, the Supreme Court, Kings County, denied petitioner's claims of ineffective assistance of counsel "to the extent that they assert matters in the trial record," but granted a hearing on the limited issue of trial counsel's failure to call Jackie Trader and Tanya Walker at trial, and assigned counsel to represent petitioner. (May 1, 1997 Order, Garson, J.)

On February 23, 1998 and November 12, 1998, Judge Garson held hearings on petitioner's claim that trial counsel was ineffective for failure to call Jackie Trader and Tanya Walker. The court heard testimony from Trader and Walker, as well as from Luther Williams, petitioner's trial counsel, and the petitioner. Jackie Trader testified that she was in front of Tiny's on the night of the incident with petitioner and another friend Tanya.[2] (440 Hr'g Tr. at 5.) She stated that individuals in front of the club were "getting into a shootout. And we was ducking behind a car and George was telling me to stay down and it was just me, him and her. . . . Then we like ran away." (440 Hr'g Tr. at 5.) On cross examination, Trader was asked whether in her affidavit she stated that she was with two women, not just one. (440 Hr'g Tr. at 17.) She stated that "Everyone split up. One shot fired, I ain't going to stay there and wait. Everybody was splitting up, you know what I'm saying?" (440 Hr'g Tr. at 17.) When asked whether her testimony was "that you were with George and a friend," she stated "[t]hat was behind the car. We was behind the car. Do you know what I'm saying?" (440 Hr'g Tr. at 17.) Trader testified that she had been contacted by petitioner's first trial counsel, but not his subsequent one, and was never called to testify at trial. (440 Hr'g Tr. at 21.)

Tanya Walker testified that she was outside Tiny's on the night of the shooting with a number of friends, and that when the shooting began, she ran to the opposite side of the street for cover. She stated that petitioner and her aunt, Jackie Artis, were bending down for cover behind

---

[2] The transcript of the hearing spells the name "Tania." (440 Hr'g Tr. at 5.)

a parked car, and that they told her to duck for cover. (440 Hr'g Tr. at 39.) On cross-examination, Walker was asked if when she got behind the car, she was accompanied by Jackie Artis and George McGuire, and she responded yes. (440 Hr'g Tr. at 52.) Walker also testified that she had called Luther Williams and spoke with him, but had not been called to testify. (440 Hr'g Tr. at 41-43.)

Luther Williams testified that he was assigned four trial ready cases, including petitioner's, when petitioner's first counsel, Alan Brenner, left the jurisdiction. (440 Hr'g Tr. at 26-27.) He stated that he "tried these four cases one after the other." (440 Hr'g Tr. at 28.) Williams did not recall specifically meeting with petitioner upon his assignment, but stated that it was his practice to meet with his clients when appointed. (440 Hr'g Tr. at 28.) He did not recall whether petitioner indicated that alibi witnesses existed, but did remember that petitioner gave him a list of witnesses. (440 Hr'g Tr. at 30.) Williams believed that "we did in fact speak with one of them and called that person at trial." (440 Hr'g Tr. at 30.) He did not recall whether or not he sought out missing witnesses, and generally did not recall the particulars of the case. (440 Hr'g Tr. at 34.)

Petitioner testified that Brenner had represented him on the charges from the time of the arraignment. (440 Hr'g Tr. at 59-60.) He stated that Williams became his attorney two weeks before trial, and on that date he had a conversation with Williams and gave him a list of witnesses. (440 Hr'g Tr. at 62.) He stated that the next time he saw Williams was at trial, and that Williams only called one witness for the defense. (440 Hr'g Tr. at 64.) Petitioner also testified that he had asked Williams to seek an adjournment to prepare for trial, but that Williams did not do so. (440 Hr'g Tr. at 77.)

On June 6, 2001, petitioner submitted another addendum to his motion to vacate based on

newly discovered evidence. Petitioner submitted affidavits signed by co-defendants Harold George and Craig Twiggs, which claimed that petitioner did not participate in the murder of Dexter Simmons. (Apr. 26, 2001 Aff, of Craig Twiggs; Apr. 16, 2001 Aff. of Harold George.)

On January 31, 2002, the court denied petitioner's remaining 440 contentions, finding that "based on Mr. Williams' testimony, counsel merely exercised his professional judgment in determining the methods and procedure in presenting a defense . . . . There is no evidence in the record to indicate that trial counsel's representation of the defendant fell below the minimum standard required." (Jan. 31, 2002 Opinion, Garson, J.) The court found with respect to the affidavits submitted by petitioner's co-defendants, that "it is patently clear that each of the two co-defendants were not available to testify on Mr. McGuire's behalf at trial," that "the affidavits of Mr. George and Mr. Twiggs have raised significant issues concerning George McGuire's participation in the shooting which led to the death of Dexter Simmons," and that "if true, [they] cast serious doubt as to George McGuire's guilt." (Jan. 31, 2002 Opinion, Garson, J.) However, the court found that the method employed to introduce the affidavits was improper, and granted permission to bring a new §440.10 motion based on newly discovered evidence. (Jan. 31, 2002 Opinion, Garson, J.) By application dated March 18, 2002, petitioner sought leave to appeal Judge Garson's January 31, 2002 decision to the Appellate Division. On May 29, 2002, the Appellate Division denied petitioner's application for leave to appeal.

D. _Petitioner's § 440.10 Motion Based on Newly Discovered Evidence_

On June 5, 2002, petitioner, through present counsel, filed a motion to vacate pursuant to C.P.L. § 440.10 on the ground that he had discovered new evidence, specifically the previously mentioned affidavits of his co-defendants, that were not discoverable before or during his trial, and that showed that he had not participated in the shooting. (Pet.'s June 5, 2002 Mot. to

Vacate.) On December 10, 2003, the court commenced a hearing where Harold George, Craig Twiggs, petitioner, and petitioner's sister testified about the 1988 incident. Twiggs and George also testified about the circumstances that led to their contacting petitioner's sister and their 2001 affidavits. (Dec. 10, 2003 440 Mot. Hr'g Tr.) Both testified that McGuire was not involved in the incident, and that they had not come forward sooner because "[i[t had nothing to do with me, know what I mean? Because if they convict a man for something he didn't do evidently the State would turn it over at some time or another." (Test. of Harold George, Dec. 11, 2003 at 186.)

On March 22, 2004, the court denied petitioner's 440 motion, concluding that "there is no probability that a jury would have been able to credit the co-defendant's testimony, and, therefore, no probability that their testimony would have altered the outcome of the defendant's trial." (Mar. 22, 2004 Opinion, Tomei, J.) On October 23, 2007, the Appellate Division, Second Department affirmed the denial of petitioner's 440 motion based on newly discovered evidence. People v. McGuire, 44 A.D.3d 968 (2d Dep't 2007). On March 21, 2008, the Court of Appeals denied petitioner's application for leave to appeal. People v. McGuire, 10 N.Y.3d 813 (2008) (Read, J.)

E. *Petitioner's § 440.20 Motion to Set Aside His Sentence*

On June 18, 2004, petitioner, pro se, filed a motion pursuant to C.P.L. § 440.20 to set aside his sentence on the ground that his consecutive sentences were illegally imposed and that his pre-sentence report was incomplete. On December 14, 2004, the Supreme Court denied the motion, finding petitioner's claims to lack merit. (Dec. 14, 2004 Opinion, Silverman, J.) On April 13, 2005, the Appellate Division, Second Department, denied petitioner's application to review the lower court's denial. (Apr. 13, 2005 Order, Miller, J.)

F. *Petitioner's Coram Nobis Petitions*

On August 8, 2007, petitioner filed a motion for a writ of error coram nobis in the Appellate Division, Second Department, on the grounds that: (1) appellate counsel was ineffective; (2) the hearing court failed to make findings of fact at the conclusion of an October 1, 1990 suppression hearing; and (3) that appellate counsel filed a brief without a full transcript, specifically, the voir dire minutes. On December 26, 2007, the Appellate Division, Second Department, denied petitioner the writ of error coram nobis, finding that petitioner had "failed to establish that he was denied the effective assistance of appellate counsel." People v. McGuire, 46 A.D.3d 922 (2d Dep't 2007.) On March 21, 2008, the Court of Appeals denied petitioner leave to appeal. People v. McGuire, 10 N.Y.3d 867 (2008) (Read, J.)

On May 29, 2008, petitioner, pro se, filed a second motion for a writ of error coram nobis, arguing that appellate counsel was ineffective for: (1) failing to argue that trial counsel was ineffective for failure to convince the trial court to issue a missing witness charge when the People learned that the two victims, Jean Paul Michel and Robert James, were unavailable; and (2) failing to argue that trial counsel was ineffective for failing to introduce the allegedly exculpatory grand jury testimony of Michel and James into evidence. On October 21, 2008, the Appellate Division denied petitioner's motion. People v. McGuire, 55 A.D.3d 853 (2d Dep't 2008). The Court of Appeals subsequently denied leave to appeal.

G. *The Current Petition*

Petitioner, through counsel, filed the instant petition on February 4, 2009. Petitioner argues that: (1) the nine years the lower New York Court took to decide his N.Y. Crim. Proc. Law § 440.10 motion violated his due process rights; (2) his trial counsel was ineffective for

failure to investigate, contact witnesses, and prepare the defense; (3) he is "actually innocent;" and (4) the sentence imposed was improper, unduly harsh and excessive.

## DISCUSSION

A. *Petitioner's Due Process Claim Based on the Delay in Deciding his § 440 Motion*

      1. <u>Exhaustion Requirement</u>

Respondent argues that petitioner's first claim based on the nine year delay in deciding his first C.P.L. § 440.10 motion was never raised in any state forum, and is therefore unexhausted. Respondent thus argues that the instant habeas petition should be dismissed because it contains at least one unexhausted claim.

Pursuant to 28 U.S.C. § 2254(b)(1), "[a]n application for a writ of habeas corpus . . . shall not be granted unless it appears that . . . the applicant has exhausted the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(1)(A). "The exhaustion doctrine requires that a prisoner seeking to upset his conviction on federal grounds must have given the state courts a fair opportunity to review his federal claim and correct the alleged error." <u>Dean v. Smith</u>, 753 F.2d 239, 241 (2d Cir. 1985). When faced with a "mixed petition," that is, petitions with both exhausted and unexhausted claims, courts may (1) dismiss the petition; (2) stay the petition and hold it in abeyance while the petitioner returns to state court to exhaust his previously unexhausted claims; or (3) deny the petition on the merits pursuant to § 2254(b)(2) notwithstanding the failure of the petitioner to exhaust remedies. <u>Rhines v. Webber</u>, 544 U.S. 269, 277 (2005); <u>see also</u> 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.").

In cases involving delay of a direct appeal, the Second Circuit has expressed doubt as to

whether there exists a procedure to present such a claim to New York courts, resulting in an absence of a state corrective process under 28 U.S.C. §2254(b), excusing the exhaustion requirement. Mathis v. Hood, 851 F.2d 612, 615 (2d Cir. 1988) (stating that "there is no [New York] state remedy available to petitioner [regarding his delay of appeal claim] and even if such remedy existed, circumstances render the state corrective process ineffective")).

Respondent argues that the proper state corrective process lies in a coram nobis petition, and states that petitioner should be required to raise his claim in such a petition before it can be deemed exhausted. However, under New York law, coram nobis is used to challenge a criminal conviction "only . . . on the ground that the defendant was deprived of the effective assistance of appellate counsel," and thus, it is not clear that petitioner would be able to address the issue of delay in a coram nobis filing. Gilliam v. Artus, 653 F.Supp.2d 315, 326-27 (W.D.N.Y. 2009) (citing People v. Gordon, 183 A.D.2d 915, 584 N.Y.S.2d 318, 318 (2d Dep't 1992)); see also Mathis, 851 F.2d at 614 ("It is unclear whether under New York law a writ of error coram nobis could have been used to bring the delay to the attention of the First Department."). While New York courts have addressed the issue of state court delay in deciding 440 motions, see, e.g., People v. Valenti, 175 A.D.2d 489 (3d Dep't 1991), those cases addressed the issue on direct appeal from the denial of the 440 motion itself. In this case, when petitioner's initial 440 motion was finally denied in 2002, he did raise the issue of the delay in the direct appeal of that denial, (Pet.'s Mot. for Leave to Appeal, Mar. 18, 2002, at 4-7), which was denied on May 29, 2002. Because the exception for the exhaustion requirement in the delay of direct appeal cases is relevant here, I decline to hold that petitioner's delay claim is unexhausted.

    2.   Whether Petitioner's Claim of Delay of his C.P.L. § 440.10 Motion is Cognizable on Habeas Review

The Second Circuit has addressed whether a given delay of a direct appeal constitutes a due process violation on habeas review under 28 U.S.C. § 2254. See Diaz v. Henderson, 905 F.2d 652 (2d Cir. 1990); Simmons v. Reynolds, 898 F.2d 865 (2d Cir. 1990). In such cases, the court looks to the criteria established in Barker v. Wingo, 407 U.S. 514 (1972), and thus focuses on the length of the delay, the reason for the delay, whether the petitioner asserted his right to a speedy appeal, and prejudice to the petitioner. See Simmons, 898 F.2d at 868; Brooks v. Jones, 875 F.2d 30, 31 (2d Cir. 1989). Even where petitioner has satisfied the Barker criteria, the Circuit has found that "[r]elease from custody is an extraordinary remedy, especially in a delay-of-appeal case where release would in effect nullify a state court conviction on grounds unrelated to the merits of the case." Simmons, 898 F.2d at 869; see also Diaz, 905 F.2d at 653 ("Since Diaz's appeal has now been heard, and he can make no claim that it was constitutionally tainted because of the delay, he is not unlawfully incarcerated and, therefore, not entitled to a writ of habeas corpus.").

A majority of circuits have held that "federal habeas relief is not available to redress alleged procedural errors in state post-conviction proceedings." Franza v. Stinson, 58 F. Supp. 2d 124, 151 (S.D.N.Y. 1999) (quoting Ortiz v. Stewart, 149 F.3d 923, 939 (9th Cir. 1998), cert. denied, 526 U.S. 1123, 119 S. Ct. 1777, 143 L.Ed.2d 806 (1999)); accord, e.g., Golden v. Kaiser, 2001 WL 15526 at *1 (10th Cir. 2001) ("[C]laims relat[ing] to alleged deficiencies in [the state's] post-conviction procedures, fail[ ] to present a viable habeas claim."); Trevino v. Johnson, 168 F.3d 173, 180 (5th Cir.), cert. denied, 527 U.S. 1056, 120 S.Ct. 22, 144 L.Ed.2d 825 (1999); Villafuerte v. Stewart, 111 F.3d 616, 632 n. 7 (9th Cir. 1997) (claim that petitioner was denied due process in state habeas proceeding is "not addressable in a section 2254 proceeding"), cert. denied, 522 U.S. 1079, 118 S.Ct. 860, 139 L.Ed.2d 759 (1998); Montgomery

v. Meloy, 90 F.3d 1200, 1206 (7th Cir.) (per curiam) ("Unless state collateral review violates some independent constitutional right, such as the Equal Protection Clause, . . . errors in state collateral review cannot form the basis for federal habeas corpus relief."), cert. denied, 519 U.S. 907, 117 S.Ct. 266, 136 L.Ed.2d 190 (1996); Williams-Bey v. Trickey, 894 F.2d 314, 317 (8th Cir.), cert. denied, 495 U.S. 936, 110 S. Ct. 2183, 109 L.Ed.2d 511 (1990). Only the First Circuit disagrees. See Dickerson v. Walsh, 750 F.2d 150 (1984).

At least two circuits have found that "delay in receiving a ruling on a discretionary state collateral appeal is not a ground for federal habeas corpus relief," finding that "[n]o constitutional provision or federal law entitles [petitioner] to any state collateral review . . . let alone prompt collateral review." Montgomery, 90 F.3d at 1206; see also Franzen v. Brinkman, 877 F.2d 26, 26 (9th Cir. 1989) (denying habeas review of a claim that the Nevada State District Court's delay of over a year in deciding a petition for state post-conviction relief violated petitioner's due process rights). Those courts hold that delay in processing a collateral claim does not make the continued imprisonment of the defendant unlawful, and hence, does not warrant federal habeas relief. Montgomery, 90 F.3d at 1206.

While the Second Circuit has not directly addressed this issue, a number of district courts within the Circuit have found that alleged procedural errors in the denial of a 440 motion, such as failure to hold a hearing or a failure to set out findings, are not cognizable on habeas review. See, e.g., Franza, 58 F.Supp.2d at 152; Jones v. Duncan, 162 F. Supp. 2d 204, 217-19 (S.D.N.Y. 2001); (" . . . Jones' assertion that the failure to hold a hearing on his CPL §§ 440.10 and 330.30 newly discovered evidence motions violated due process is not cognizable on federal habeas review."); Diaz v. Greiner, 110 F. Supp. 2d 225, 235 (S.D.N.Y. 2000) ("Petitioner's unsupported assertion that the trial court denied his (third) CPL § 440.10 motion without a hearing violated

due process is not cognizable on federal habeas review."); Sparman v. Edwards, 26 F. Supp. 2d 450, 468 n. 13 (E.D.N.Y. 1997) ("the weight of authority holds that in habeas corpus proceedings federal courts do not have jurisdiction to review state court denials of motions for a new trial"), aff'd, 154 F.3d 51 (2d Cir. 1998); Michael v. Dalsheim, 1991 WL 99368 at *9 (E.D.N.Y. May 22, 1991) (denying review of 440 court's failure to order a hearing); Turner v. Sullivan, 661 F.Supp. 535, 540-41 (E.D.N.Y. 1987) (claim that trial court violated due process by denying CPL §§ 440.10 motion without setting out findings, conclusions and its reasoning not cognizable on federal habeas review), aff'd, 842 F.2d 1288 (2d Cir.), cert. denied, 487 U.S. 1240, 108 S.Ct. 2913, 101 L.Ed.2d 944 (1988). One court in this circuit has specifically found that a claim based on delay in the decision of an appeal of the denial of a CPL § 440.10 motion is not cognizable on federal habeas review. See Morales, 2002 WL 32375006, at *2.

In Montgomery, the claims asserted in the allegedly delayed state collateral proceeding at issue were errors at trial, specifically that the prosecutor violated Doyle v. Ohio, 426 U.S. 610 (1976), and a state rule of evidence. Montgomery, 90 F.3d at 1203. Such claims could be brought on direct appeal, a delay of which would be cognizable under Seventh Circuit law. Id. at 1206 (citing Allen v. Duckworth, 6 F.3d 458, 459-60 (7th Cir. 1993). Similarly, in Morales, the claim in petitioner's 440.10 motion at issue was that a second indictment filed against petitioner was illegally re-presented, a claim that could also have been raised on direct appeal. Morales, 2002 WL 32375006, at *4. However, under New York law, when ineffective assistance of counsel claims are based on matters outside the record, they must "be pursued by way of a CPL § 440.10 motion," and are unreviewable on direct appeal. Quinones v. Miller, 2003 WL 21276429, at *21 (S.D.N.Y. 2003) (quoting People v. Kazmirski, 299 A.D.2d 826, 827 (4th

Dept. 2002); <u>Byron v. Ercole</u>, 2008 WL 2795898, *13 (E.D.N.Y. 2008).[3]  Additionally, as discussed above, petitioners are required to exhaust such claims through state remedies prior to the filing of a habeas petition. <u>See</u> 28 U.S.C. § 2254(b)(1)(A).  If New York state law requires that a petitioner bring off-record ineffective assistance of counsel claims by way of a 440.10 motion, and federal law requires exhaustion of that claim, to deny a petitioner the ability to argue that delay of a 440.10 motion prejudiced the very claims he asserts in his federal habeas petition would run afoul of the basic principles of the direct-appeal delay cases and habeas relief itself. Because of the requirement in New York that petitioners bring off-record ineffective assistance of counsel claims via a separate 440.10 motion, and because delay of adjudication of such a claim bears close resemblance to the delay-of-direct appeal claims found cognizable in this Circuit, I cannot find that petitioner's delay claim is unreviewable on habeas review despite the majority rule.

### 3.   The Merits of Petitioner's Delay Claim

In the delay of direct appeal cases, courts look to the length of the delay, the reason for the delay, whether the petitioner asserted his right to a speedy appeal, and prejudice to the petitioner. <u>See</u> <u>Simmons</u>, 898 F.2d at 868; <u>Brooks v. Jones</u>, 875 F.2d 30, 31 (2d Cir. 1989).

First, I note that petitioner himself filed a supplemental 440.10 motion in March 1995 raising additional claims, and another addendum in June 2001, and thus cannot claim that the nine year delay in receiving a final disposition was purely due to a deficiency in the state court process.  However, petitioner did write to the 440.10 court seeking an Order on his motions in 1996, and on April 8, 1997, moved for a writ of mandamus pursuant to Article 78 of New York's

---

[3] <u>See also</u> <u>People v. Brown</u>, 45 N.Y.2d 852 (1978) ("... in the typical case, it would be better, and in some cases essential, that an appellate attack on the effectiveness of counsel be bottomed on an evidentiary exploration by collateral or post-conviction proceeding brought under CPL 440.10.").

Civil Practice Law and Rules to compel the court to issue a decision.

Nevertheless, petitioner cannot show that he was prejudiced by the delay. Petitioner claims that he was prejudiced given that a hearing on his ineffective assistance of counsel claim did not take place until 1998, almost ten years after the incident. Because petitioner's prejudice argument is based on the 1998 hearings, it is the five year delay from petitioner's date of filing, April 20, 1993, to the 1998 hearings that is the relevant period. Petitioner claims that delay resulted in trial counsel's inability to recall his trial strategy and the loss of the case file which would have strengthened his ineffective assistance claim.

At the November 12, 1998 hearing, Luther Williams did not recall particulars of the case, whether he had contacted all of petitioner's proposed witnesses, or whether he had hired an investigator. (Nov. 12, 1998 Hr'g Tr. at 27-35.) Additionally, Williams had discarded the case file as at the time of the hearing as the case was over five years old, and was thus unable to refresh his recollection about his strategy and preparation on the case. (Nov. 12, 1998 Hr'g Tr. at 30.) Williams did review the court file prior to testifying, but was still unable to recall particular facts of the case. The court stated that it found "that based on Mr. Williams' testimony, counsel merely exercised his professional judgment in determining the methods and procedure in presenting a defense to the within incident." (Jan 31, 2002 Order, at 1.)

First, the Second Circuit has stated that a trial counsel's inability to remember his trial strategy is insufficient to overcome the presumption of effective assistance. See Greiner v. Wells, 417 F.3d 305, 325 (2d Cir. 2005) ("Wells relies almost entirely . . . on [trial counsel's] inability to remember his reasons for conducting the trial in the manner that he did. This is insufficient evidence to overcome the presumption of constitutionally effective counsel sustained by the record . . . ."). While there was no claim in Greiner that the state was responsible for the delay

that resulted in trial counsel's inability to recall his decision-making processes, the language suggests that no prejudice can be found in a delay claim where the only result is memory loss on the part of trial counsel.

Regardless, as discussed in the following section, petitioner has not met the Strickland standard with respect to his ineffective assistance of counsel claim for reasons independent of his lawyer's lack of memory and the loss of the file. Because he did not in fact suffer ineffective assistance of counsel, he cannot claim that his claim was prejudiced as a result of the 440 court's delay.

Accordingly, his delay claim is denied.

B. *Petitioner's Ineffective Assistance of Counsel Claim*

1. Standard of Review

The Anti-Terrorism and Effective Death Penalty Act ("AEDPA"), enacted in 1996, established a deferential standard that federal habeas courts must apply when reviewing state court convictions. 28 U.S.C. § 2254(d). The statute provides, in pertinent part:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

Id. The statutory language "clearly established Federal law, as determined by the Supreme Court of the United States" refers to "the holdings, as opposed to the dicta, of [the Supreme] Court's

decisions as of the time of the relevant state-court decision." <u>Williams v. Taylor</u>, 529 U.S. 362, 412 (2000). A state court decision is "contrary to" clearly established Supreme Court precedent if "the state court applies a rule that contradicts" Supreme Court precedent or if "the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from that precedent." <u>Id</u>. at 405-06. With respect to the "unreasonable application" clause, "a federal habeas court . . . should ask whether the state court's application of clearly established federal law was objectively reasonable." <u>Id</u>. at 409.

In order to demonstrate ineffective assistance of counsel, the petitioner must satisfy the two prong test established in <u>Strickland v. Washington</u>, 466 U.S. 668 (1984). Under <u>Strickland</u>, a petitioner must demonstrate, first, that counsel's performance fell below "an objective standard of reasonableness" under "prevailing professional norms," <u>id</u>. at 688, and second, that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." <u>Id</u>. at 698. A court need not decide both prongs of the <u>Strickland</u> test for ineffective assistance of counsel if a party has made an insufficient showing on one. <u>See</u> <u>Id</u>. at 697.

In analyzing a claim that counsel's performance fell short of constitutional standards, the court must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." <u>Id</u>. at 689. Moreover, "[i]n assessing the attorney's performance, a reviewing court must judge his conduct on the basis of the facts of the particular case, 'viewed as of the time of counsel's conduct, and may not use hindsight to second-guess his strategy choices.'" <u>Mayo v. Henderson</u>, 13 F.3d 528, 533 (2d Cir. 1994) (<u>quoting</u> <u>Strickland</u>, 466 U.S. at 690). Thus, a petitioner cannot prevail on a claim of ineffective assistance merely

because he disagrees with his counsel's strategy. See Strickland, 466 U.S. at 689. However, failure to pursue a particular course of action is not considered strategic when it is not a "conscious, reasonably informed decision made by an attorney with an eye to benefitting his client." See Pavel v. Hollins, 261 F.3d 210, 218 (2d Cir. 2001).

2. Trial Counsel's Alleged Failure to Investigate and Call Alibi Witnesses

In this action, petitioner claims that trial counsel was ineffective for his failure to investigate, specifically, his failure to investigate two potential alibi witnesses provided to him by petitioner prior to trial. When this claim was raised by petitioner in his 440 hearing, those witnesses, Jackie Trader and Tanya Walker, provided affidavits to the state courts stating that they were willing to testify, and that they had been behind a car with petitioner at the time of the shooting. Both witnesses, and petitioner's trial counsel, testified at the 440 hearing in 1998.

i. *Tanya Walker*

Both the affidavit of Tanya Walker and the transcript of her testimony from the November 1998 hearing show that trial counsel did in fact speak with Walker and chose not to call her at trial. At the November 1998 hearing, Walker stated that she spoke to Luther Williams, petitioner's trial counsel, and was asked whether when they spoke, Williams had asked "how the incident occurred." She replied "No, he didn't get into details." (Nov. 12, 1998 Hr'g Tr. at 43-44.) She was later asked, "Did you tell Mr. Williams – we're talking about Mr. Williams. Did you tell him you were with the defendant?" She replied "Yes." She was then asked, "[a]nd you told him as you explained it to us this morning?" She replied "Yes, I did." (Nov. 12, 1998 Hr'g Tr. at 44.) Her affidavit states that she spoke with Mr. Williams, and that "he informed me that he would not be calling me to testify. He said my testimony is not needed .

. . ." (Aug. 19, 1992 Aff. of Tanya Walker, ¶ 17.)

Thus, the record shows that trial counsel did fulfill his duty to investigate Walker as a potential trial witness, and specifically made a decision not to call her. Courts applying Strickland are especially deferential to defense attorneys' decisions concerning which witnesses to put before the jury. Greiner v. Wells, 417 F.3d 305, 323 (2d Cir. 2005). "The decision not to call a particular witness is typically a question of trial strategy that [reviewing] courts are ill-suited to second-guess." United States v. Luciano, 158 F.3d 655, 660 (2d Cir.1998) (per curiam). Thus, "counsel's decision as to 'whether to call specific witnesses - even ones that might offer exculpatory evidence - is ordinarily not viewed as a lapse in professional representation.'" United States v. Best, 219 F.3d 192, 201 (2d Cir. 2000) (quoting United States v. Schmidt, 105 F.3d 82, 90 (2d Cir. 1997)); see also United States v. Romero, 54 F.3d 56, 60 (2d Cir. 1995). In this case, because Williams did in fact contact Walker and chose not to call her, the record shows that he did conduct an investigation and specifically chose not to call her, and this court is "ill-suited to second-guess" that decision. Best, 219 F.3d at 201. Accordingly, I cannot find that trial counsel's failure to call Walker was deficient under the Strickland standard.

### ii. *Jackie Trader*

There is, however, no evidence in the record that trial counsel actually contacted Jackie Trader. Trader's 1992 affidavit and the testimony at the 1998 C.P.L. § 440 hearing show that she would have testified that she was with petitioner behind the car at the time of the shooting.

A sound trial strategy must be based on reasonable investigations. Espinal v. Bennett, 588 F. Supp. 2d 388, 399 (E.D.N.Y. 2008). In preparing for trial, "'[c]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.'" Lindstadt v. Keane, 239 F.3d 191, 200 (2d Cir.2001) (quoting Strickland, 466

U.S. at 691, 104 S.Ct. 2052). <u>See also</u> <u>Gersten v. Senkowski</u>, 426 F.3d 588, 607 (2d Cir. 2005).

A reasonable decision to forego investigation may be based on a reasoned judgment that such

investigation would be fruitless, wasteful, or even counterproductive. <u>Espinal</u>, 588 F. Supp. 2d at

399 (citing <u>Schulz v. Marshall</u>, 528 F. Supp. 2d 77, 95-96 (E.D.N.Y. 2007)).  But a failure to

conduct reasonable investigation into possible alibi evidence, in the absence of such a reasonable

explanation, falls below the standard of effective representation required by <u>Strickland</u>. <u>Id.</u>

(citing <u>Lindstadt</u>, 239 F.3d at 200; <u>Schulz</u>, 528 F. Supp. 2d at 96; <u>Sparman v. Edwards</u>, 26 F.

Supp. 2d 450, 452-53 (E.D.N.Y.1997)).

 In this case, petitioner testified that he provided a list of potential witnesses to Williams

which included Trader's name, and Trader provided an affidavit to the state courts stating what

her testimony would have consisted of and that she was willing to testify.  Additionally, at the

440 hearing, while Williams did not specifically remember being given Trader's name, he

testified that he did recall getting a list of potential witnesses from petitioner, and that "I believe

that we did in fact speak with one of them and called that person at trial," presumably meaning

only Latasha Carlisle. (Nov. 12, 1998 Hr'g Tr. At 30.)  The record shows that he did in fact call

Carlise, who provided testimony about petitioner's alibi, and specifically rejected Walker as a

potential witness.  However, trial counsel also admitted that he did not believe he hired an

investigator, and that he had four trial ready cases for which he was preparing at the same time,

including petitioner's, and had a "relatively short period of time" between being appointed and

the start of trial. (Nov. 12, 1999 Hr'g Tr. At 34-36.)  There is no evidence in the record that he

attempted to contact Trader, actually interviewed her, or made a conscious decision to not have

her testify at trial.  Thus, based on the record, it is questionable whether trial counsel conducted a

reasonable investigation required of him under the <u>Strickland</u> standard.

However, I cannot find that petitioner was prejudiced by counsel's failure to investigate. An analysis of the second prong of <u>Strickland</u> would include an inquiry as to whether the failure to *call* Trader actually prejudiced petitioner, that is, petitioner could only show prejudice if trial counsel's investigation of Trader would have led to additional trial testimony, with which there would be a reasonable probability that the trial outcome would have differed.

As to the whereabouts of petitioner at the time of the shooting, to the extent Trader's testimony would have included facts already testified to by Latasha Carlisle, that is, petitioner was across the street at the time of the shooting and did not participate, such testimony could be considered repetitive or cumulative. Courts in this circuit have stated that the failure to call cumulative or repetitive witnesses is neither ineffective nor prejudicial. <u>Montalvo v. Annetts</u>, 2003 WL 22962504, at *26 (S.D.N.Y. 2003); <u>Archer v. Fischer</u>, 2009 WL 1011591, at *33 (E.D.N.Y. 2009); <u>see also</u> <u>Treppedi v. Scully</u>, 1986 WL 11449 at *3 (S.D.N.Y. Oct. 9, 1986) ("Since the effect of the presentation of additional alibi witnesses would have been cumulative at best, the failure of counsel to call additional alibi witnesses cannot be considered an error that deprived the defendant of a fair trial."), <u>aff'd</u>, 847 F.2d 837 (2d Cir. 1988).[4]

Second, to the extent Trader would have provided additional facts, those facts would have contradicted facts testified to by Carlisle. For instance, Trader's 1992 affidavit stated that she was with two other girls and petitioner at the time of the shooting, but Carlisle's testimony as

---

[4] The Second Circuit, however, has not specifically defined "cumulative" under the prejudice prong of <u>Strickland</u>. Other circuits have stated that testimony is not "cumulative" merely because it corroborates existing testimony. The Sixth Circuit, for example, has stated that "[a]lthough it is true that [the witness] would merely have corroborated [petitioner's] version of events, the court failed to recognize that the trial was essentially a swearing match . . . . Undoubtedly, the testimony of a second person to corroborate the [petitioner's] version of the events would not have been cumulative, but rather could have critically added to the strength of the defense's case." <u>English v. Romanowski</u>, 602 F.3d 714, 727 (6th Cir. 2010). <u>See also</u> <u>Bigelow v. Williams</u>, 367 F.3d 562, 574-75 (6th Cir. 2004) (finding multiple alibi witnesses not cumulative to defense despite fact that one other witness already testified to same facts); <u>Washington v. Smith</u>, 219 F.3d 620, 634 (7th Cir. 2000) ("Evidence is cumulative when it 'supports a fact established by existing evidence,' Black's Law Dictionary 577 (7th ed. 1999), but Washington's whereabouts on the day of the robbery was far from established - it was the issue in the case.").

to whom she was with at the time makes no mention of Trader. Trader's testimony at the 440 hearing indicates that she was with petitioner and "Tanya," and that it was just the three of them behind the car. Trader did not indicate that she could not remember with whom she was behind the car, or that there were other individuals there that she could not recall, and thus her testimony specifically contradicts elements of Carlisle's testimony as opposed to corroborating it.

In addition, Trader testified at the 440 hearing to being at Tiny's with petitioner, and knowing petitioner's family well. Thus, this is not an instance where a disinterested witness would have provided additional facts or testimony. See, e.g., Montgomery v. Petersen, 846 F.2d 407, 415 (7th Cir.1988) (finding prejudice in failure to call additional, disinterested alibi witness, noting that "the jury might well have viewed the otherwise impeachable testimony of the twelve witnesses who were presented at the . . . trial in a different light had the jury also heard the testimony of this disinterested witness"); see also Rosario v. Ercole, 601 F.3d 118, 141 (2d Cir. 2010) (Straub, dissenting) (finding prejudice where ". . . many of these [uncalled alibi] witnesses were not vulnerable to impeachment as interested witnesses because they were not close friends with Rosario.").

Petitioner is correct that the evidence against him was not overwhelming. There was only one witness, Tanya Kimbrough, who stated that petitioner was involved in the shooting. This witness admitted to signing a document that said her statements to the police following the shooting were false, though she stated during her testimony that the contents of the document were not true and called into question the circumstances surrounding the signing of that document. Thus, trial counsel's failure to investigate trader is troubling. However, because trial counsel did call Latasha Carlisle as an alibi witness, who testified both to the whereabouts of petitioner at the time of the shooting and the credibility of the prosecution's witness, Trader's

testimony would either have been cumulative, or in fact contradictory, and she would have been impeachable as an "interested" witness. Thus, I cannot find that but for trial counsel's failure to investigate Jackie Trader as a potential witness, there is a reasonable probability that the outcome of the trial would have differed.

### iii. *Petitioner's Additional Claims*

Petitioner also claims that trial counsel failed to adequately consult with him prior to trial. The Supreme Court has stressed the "vital" importance of "consultation, thorough-going investigation and preparation" during the time period from arraignment to trial. Powell v. Alabama, 287 U.S. 45, 57 (1932). However, petitioner has not shown what counsel would have learned through additional consultations that would have changed the outcome of the proceedings. Petitioner claims he gave Williams a list of potential witnesses, and Williams' defense strategy was the very defense petitioner still holds to be true – that he was simply present at Tiny's the night of the incident, but did not take part in the shooting.

To the extent petitioner claims trial counsel was ineffective for failing to hire an investigator to seek out additional witnesses, petitioner has not shown with any specificity what such an investigation might reveal, and thus has failed to show either that counsel was deficient for failing to do so, or that he was prejudiced as a result.

Finally, petitioner claims that trial counsel was ineffective for failing to interview Tanya Kimbrough before she testified for the prosecution. The record shows that when Kimbrough was brought in by the prosecution under a material witness warrant, trial counsel sought permission from the court to speak with her before she took the stand. (Trial Tr. at 72.) The prosecutor indicated that "I have asked Ms. Kimbrough whether she wishes to speak to Mr. Williams. She indicates she does not." (Trial Tr. at 72.) Trial counsel cannot be found deficient if Kimbrough

was not willing to be interviewed.

Accordingly, petitioner's ineffective assistance of counsel claim is denied.

C. *Petitioner's Claim of Actual Innocence*

Petitioner also argues that considering all of the evidence, including later statements made by petitioner's co-defendants, it is more likely than not that no reasonable juror would have found petitioner guilty. Petitioner challenges the denial of his § 440.10 motion based on newly discovered evidence, specifically the finding that his co-defendants' testimony that petitioner was not involved in the shooting outside Tiny's was inconsistent and "incredible and unworthy of belief because it contradicts the sworn statement made in their May, 1991, plea allocutions." Petitioner argues that Harold George and Craig Twiggs' testimony was in fact consistent on key points, and that their testimony, when viewed with the other evidence in the case, makes it hard to fathom how a reasonable juror could have found petitioner guilty beyond a reasonable doubt. (Pet.'s Br. at 98.)

While claims of "actual innocence" may serve to excuse procedural default on habeas review, see Schlup v. Delo, 513 U.S. 298, 327 (1995); and potentially serve as an exception to AEDPA's statute of limitations, see Whitley v. Senkowski, 317 F.3d 223, 225 (2d Cir. 2003) ("The constitutionality of the AEDPA's statute of limitations if applied to a claim of actual innocence is an open question today."), "claims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the course of the underlying state criminal proceedings." Herrera v. Collins, 506 U.S. 390, 400 (1993). Thus, to the extent petitioner has alleged a free-standing "actual innocence" claim, such a claim is not cognizable. Petitioner has not alleged that the decision of the § 440.10 motion based on newly discovered evidence was contrary to, or

involved an unreasonable application of, clearly established federal law.  Rather, he argues that the court erred in its interpretation of the facts.  Even if the affidavits and testimony provided by petitioner's co-defendants cast serious doubt as to his guilt, he has not alleged a separate constitutional violation on the part of the 440 court, and thus, his claim must fail.

### D. *Petitioner's Sentencing Claim*

Petitioner claims that his sixty years to life sentence was improper, unduly harsh, and excessive. Petitioner points to the comparatively low sentence of fifteen years to life imposed on his co-defendants, who pled guilty and were sentenced following petitioner's trial and sentence.

Petitioner was not interviewed by the Department of Probation because he was ill at the time of the interview. (Sentencing Tr. at 15.)  At sentencing, the judge found petitioner to be a second violent felony offender based on a previous conviction for burglary in the second degree. (Sentencing Tr. at 11.)  The sentencing judge later stated that "[h]e really could be sentenced as a persistent felony offender.  But the nature of my sentence . . . is tantamount to the same sentence that he would get as a persistent felony offender." (Sentencing Tr. at 18.)  Petitioner states he in fact did not have at least two predicate violent felonies. (Pet.'s Br. at 100.)  The court sentenced petitioner to consecutive terms of imprisonment of twenty-five years to life for the murder of Dexter Simmons, and twelve and one-half years for the attempted murder of Leslie Lewis. (Sentencing Tr. at 18.)  In addition, the court sentenced petitioner to two concurrent sentences of seven and one-half years to fifteen years on the assault counts, which were to run consecutively to the sentences for murder and attempted murder. (Sentencing Tr. at 18-19.)  The court also sentenced defendant to two consecutive sentences of seven and one-half to fifteen years, and one concurrent sentence of seven and one-half to fifteen years on the weapon possession counts. (Sentencing Tr. at 18-19.)  These sentences were to run consecutively to the sentences given for

the murder, attempted murder and assault counts. (Sentencing Tr. at 19.)  The total aggregate

sentence amounted to 60 years to life imprisonment.  On June 3, 1991, the court sentenced Craig

Twiggs and Harold George to fifteen years to life.

As to petitioner's argument that the sentence was unduly excessive, it is well settled that

a habeas petitioner's challenge to the length of his prison term does not present a cognizable

constitutional issue if the sentence falls within the statutory range.  See Townsend v. Burke, 334

U.S. 736, 741 (1948) ("The [petitioner's] sentence being within the limits set by the statute, its

severity would not be grounds for relief here even on direct review of the conviction, much less

on review of the state court's denial of habeas corpus."); White v. Keane, 969 F.2d 1381, 1383

(2d Cir. 1992) ("No federal constitutional issue is presented where, as here, the sentence is

within the range prescribed by state law.").  Petitioner does not currently argue that the

consecutive sentences violated any statutory provision.[5]

To the extent that petitioner suggests that he was penalized for rejecting a plea offer and

proceeding to trial, he does not raise a claim of actual vindictiveness because he fails to

demonstrate that the trial judge stated or implied that the sentence was based on any refusal of a

plea offer.  See Jacobs v. West, 2009 WL 2378673 (W.D.N.Y. 2009); Russ v. Greene, 2009 WL

2958007, at *11 (W.D.N.Y. 2009) ("Thus, the mere fact that the trial court . . . imposed a

considerably longer sentence than the one . . . offered in connection with the plea offer, does not,

in and of itself, establish 'actual vindictiveness.'") (citations omitted); Naranjo v. Filion, 2003

WL 1900867, at *10 (S.D.N.Y. Apr.16, 2003) (denying habeas claim based on disparity between

---

[5] While Section 70.25(2) of the New York Penal Law provides that sentences must run concurrently if they relate to "two or more offenses committed through a single act or omission," the New York Court of Appeals has held that this language permits consecutive sentences to be imposed "where the crimes are committed through separate and distinct acts, even though part of a single transaction." People v. Salcedo, 92 N.Y.2d 1019, 1021 (1998); see also Romero v. Rock, 2010 WL 908844, at *19 (S.D.N.Y. 2010).  Petitioner argued that his consecutive sentences were improper in his 2004 CPL § 440.20 motion, which was denied.

pre-trial offer of five to ten years and ultimate sentence of twenty-five to fifty years; such difference did not establish claim of actual vindictiveness because judge never suggested that sentence based on refusal of plea offer).  Courts have also found that the "mere disparity" of a sentence, even among co-defendants, does not alone suggest that one defendant has been arbitrarily singled out for a more severe punishment. Guerrero-Guerrero v. Clark, 687 F. Supp. 1022, 1028 (E.D.Va.1988) (citing United States v. Truelove, 482 F.2d 1361 (4th Cir.1973) (per curiam)).

Petitioner also argues that the sentencing court erroneously found that petitioner "could be sentenced as a persistent felony offender."  The sentencing court seemed to make that statement based in part on a youthful offender adjudication for attempted burglary in the second degree, which under New York law, cannot serve as a predicate offense. See, e.g., People v. Klein, 35 A.D.2d 528 (N.Y.A.D. 1970).

It is well established that "[m]isinformation or misunderstanding that is materially untrue regarding a prior criminal record, or material false assumptions as to any facts relevant to sentencing, renders the entire sentencing procedure invalid as a violation of due process." United States v. Malcolm, 432 F.2d 809, 816 (2d Cir. 1970) (citing Townsend v. Burke, 334 U.S. 736, 740-41 (1948). The Second Circuit has stated that for a sentence to be unconstitutional, actual reliance on the erroneous information need not necessarily be shown. See United States v. Robin, 545 F.2d 775, 779 n. 12 (2d Cir. 1976).  In McGee v. United States, 462 F.2d 243 (2d Cir. 1972), the Second Circuit set aside a sentence after concluding that the sentencing judge's reliance on an improper factor was "quite probable." Id. at 246.

However, petitioner had not raised a "misinformation" due process claim before the state courts.  On direct appeal, he argued only that the sentence was harsh and excessive, and in his §

440.20 motion dated June 18, 2004, he argued only that the consecutive sentences were improper under state law, and that missing information in the presentence report violated state law and petitioner's Eighth Amendment rights. (Pet.'s § 440.20 Mot., June 18, 2004, at 14-17.) Accordingly, petitioner's misinformation claim is unexhausted. Petitioner could raise the claims anew in a successive § 440.20 motion because there is no time limit within which to file such a motion, and more than one motion to set aside a sentence is permissible so long as the ground or issue raised was not previously determined on the merits in a direct appeal. C.P.L. § 440.20(1), (2).

The Supreme Court <u>Rhines v. Webber</u>, 544 U.S. 269, 277 (2005), cautioned that the "stay and abeyance" option to allow petitioners to exhaust claims should be "available only in limited circumstances." <u>Id.</u> at 277. The Court stated that "stay and abeyance is only appropriate when the district court determines there was good cause for the petitioner's failure to exhaust his claims first in state court." <u>Id.</u> The Court also stated that "even if a petitioner had good cause for that failure, the district court would abuse its discretion if it were to grant him a stay when his unexhausted claims are plainly meritless." <u>Id.</u> (citing 28 U.S.C. § 2254(b)(2)).

While I cannot say based on the record that petitioner's claim is "plainly meritless,"[6] petitioner has not shown good cause for failure to exhaust this claim in state court. Petitioner has not shown that he actively pursued such a claim at any point in the lengthy procedural history, or that information regarding the claim was at any point unavailable to him until now.

Accordingly, petitioner's sentencing claim is denied.

---

[6] A reading of the sentencing minutes suggests that it was "quite probable" that the sentencing judge relied on a belief that he could have sentenced petitioner as a persistent felony offender, given the length of petitioner's aggregate sentence. The court's misinterpretation was potentially exacerbated by the lack of a complete pre-sentence report. While petitioner is denied a stay of the present habeas petition, as discussed above, he does not appear to be barred from pursuing this argument in state court under a CPL § 440.20 motion.

**CONCLUSION**

For the reasons stated above, the petition for a writ of habeas corpus is denied. Because petitioner has not made a substantial showing of the denial of a constitutional right with respect to his actual innocence and sentencing claims, a certificate of appealability will not issue as to those claims. <u>See</u> 28 U.S.C. § 2253(c)(2). A certificate of appealability is granted with respect to the sole issues of petitioner's claim regarding the delay of his § 440 motion, and his ineffective assistance of counsel claim. The Clerk of Court is directed to enter judgment accordingly.

The Clerk of Court is directed to enter judgment accordingly.

SO ORDERED.

s/ ARR

_____
Allyne R. Ross
United States District Judge


Dated:      August 26, 2010
             Brooklyn, New York

<u>Service List:</u>

<u>Petitioner</u>:
George McGuire
# 90-T-4423
Sullivan Correctional Facility
P.O. Box 116
Fallsburg, NY 12733


<u>Attorney for Petitioner</u>:
Laura Solinger Esq.
51020 Maine Road
South Road, NY 11971

<u>Attorney for Respondent</u>:
Thomas S. Burka
Assistant District Attorney
Kings County District Attorney Office
350 Jay St.
Brooklyn, New York,  NY 11201